IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL L.[1] | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| FRANK BISIGNANO, Commissioner | : | |
| of Social Security[2] | : | NO.  24-5785 |

**MEMORANDUM AND ORDER**

CAROLINE GOLDNER CINQUANTO, U.S.M.J.                    January 29, 2026

Plaintiff seeks review of the Commissioner's decision denying his applications for

disability insurance benefits ("DIB") and supplemental security income ("SSI").[3]  For the

reasons that follow, I conclude that the decision of the Administrative Law Judge

("ALJ") is supported by substantial evidence and affirm the Commissioner's decision.

---

[1]Consistent with the practice of this court to protect the privacy interests of plaintiffs in social security cases, I will refer to Plaintiff using his first name and last initial.  See Standing Order – In re:  Party Identification in Social Security Cases (E.D. Pa. June 10, 2024).

[2]Frank Bisignano was appointed Commissioner of Social Security on May 6, 2025.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. Bisignano should be substituted as the defendant in this case.  No further action need be taken to continue this suit pursuant to section 205(g) of the Social Security Act.  42 U.S.C. § 405(g).

[3]In order to be eligible for DIB, Plaintiff must establish that he became disabled prior to the expiration of his insured status or date last insured ("DLI").  20 C.F.R. § 404.131(b).  SSI does not have any such requirement.  Here, Plaintiff's DLI was June 30, 2025.  Tr. at 25, 253.

## I.    <u>PROCEDURAL HISTORY</u>

Plaintiff protectively filed applications for DIB and SSI on February 9, 2022, alleging disability beginning on March 15, 2019, as a result of high blood pressure, high cholesterol, depression, anxiety, prostate issues, herniated discs, cellulitis in both thumbs, acid reflux, and thyroid issues. <u>Tr.</u> at 79, 89, 234, 260. His applications were denied initially on August 16, 2022, <u>id.</u> at 125-28 (DIB), 130-33 (SSI), and again upon reconsideration on January 19, 2023. <u>Id.</u> at 135-36 (SSI), 138-40 (DIB). On March 23, 2023, Plaintiff requested an administrative hearing. <u>Id.</u> at 144-45. After holding a hearing on September 21, 2023, <u>id.</u> at 43-78, the ALJ issued an unfavorable decision on December 13, 2023. <u>Id.</u> at 25-37. The Appeals Council denied Plaintiff's request for review on September 12, 2024, <u>id.</u> at 1-4, making the ALJ's December 13, 2023 decision the final decision of the Commissioner. 20 C.F.R. §§ 404.981; 416.1481.

Plaintiff sought review in federal court on October 30, 2024, Doc. 1, and the matter is now fully briefed. Docs. 8-10. The case was originally assigned to my colleague, the Honorable Pamela A. Carlos, and was reassigned to me. Docs. 11.[4]

## II.    <u>LEGAL STANDARD</u>

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 429, 431 (3d Cir. 1999). Therefore, the issue in this case is

---

[4]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). <u>See</u> Standing Order – In Re: Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Docs. 4, 13.

whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla."  Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014) (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 587 U.S. 97, 103 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The court has plenary review of legal issues. Schaudeck, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

> 1.      Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.      If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities that has lasted or is expected to last for a continuous period of 12 months;
>
> 3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;

4.    If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his past work; and

5.    If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak, 777 F.3d at 610; see also 20 C.F.R. § 404.1520(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of his age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

## III.    DISCUSSION

### A.    ALJ's Findings and Plaintiff's Claims

In her December 13, 2023 decision, the ALJ found at step one that, "[d]espite an alleged onset date of March 15, 2019, at the hearing, [Plaintiff] testified that he did not stop working until March 2020." Tr. at 28 (citing Hearing Recording [id. at 50]).  At step two, the ALJ found that Plaintiff has the following severe impairments:  degenerative disc disease ("DDD") of the lumbar spine, degenerative joint disease ("DJD") of the left knee, status-post ACL reconstruction, and cellulitis of the bilateral thumbs.  Id. at 28.  At the third step, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments."  Id. at 30.  The ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform light work except he can occasionally climb ramps or stairs, stoop,

4

crouch, kneel, and use of foot controls bilaterally; never crawl or climb ladders, ropes, or scaffolds; frequently handle, finger, and feel with the bilateral upper extremities; and should avoid concentrated exposure to extreme cold, wetness or humidity, vibration, driving vehicles, unprotected heights, and moving machinery." Id. at 31.  At the fourth step, the ALJ found Plaintiff is unable to perform any of his past relevant work.  Id. at 35. Based on the Plaintiff's age, education, experience, and RFC, a vocational expert ("VE") testified that Plaintiff could perform the jobs of cashier, sorter, and office helper.  Id. at 74-75.  Based on this testimony, the ALJ found that Plaintiff is not disabled.  Id. at 36.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to properly consider the opinion evidence, as well as conduct a function-by-function assessment, in crafting the RFC assessment.  Doc. 8.   Defendant responds that the ALJ's determination is supported by substantial evidence and that the ALJ properly considered the opinion evidence.  Doc. 9.  Plaintiff has filed a Reply.  Doc. 10.

### B.    Plaintiff's Claimed Limitations and Testimony at the Hearing

Plaintiff was born on February 8, 1970.  Tr. at 68, 211.  He completed eleventh grade and earned a General Educational Development ("GED") certificate in June of 1995.  Id. at 262, 900.  Plaintiff has past relevant work for Mack Trucks as a production worker/repairman, yard jockey, and material technician, and as a concrete finisher for Bethlehem Precast.  Id. at 69-73.  Plaintiff was 50 years old when he stopped working in March 2020, and 53 years old at the time of the ALJ's decision on December 13, 2023. Id. at 68, 211.

At the administrative hearing, Plaintiff testified as follows.  He stopped working at Mack Trucks because he had to have surgery on his thumbs.  <u>Tr.</u> at 51.  He explained that he is "missing parts of [his] thumb" and "the skin is so thin that a normal thing like putting a screw on a bolt is a challenge."  <u>Id.</u> at 67.  When asked why he could not work, Plaintiff said that he has pain in his left side from his back down to his hip and into his knee and that he is "not really good with other people."  <u>Id.</u> at 52.  Plaintiff has pain all day that is severe if he tries to stand up straight.  <u>Id.</u> at 53.  He estimated that he could sit and stand for about ten minutes at a time before having to change position.  <u>Id.</u> at 56.  Plaintiff can lift and carry ten pounds comfortably, but has difficulty using his hands due to pain in his thumbs in the cold.  <u>Id.</u> at 56-57.  Neither physical therapy nor prescribed pain medications helped Plaintiff's hip pain.  <u>Id.</u> at 65-66.

At the time of the administrative hearing, Plaintiff was not seeing a counselor or psychiatrist, but was on a waiting list for treatment.  <u>Tr.</u> at 57.  Plaintiff was taking Zyprexa[5] as prescribed in the hospital, and he treated his anxiety with medical marijuana.  <u>Id.</u>  Plaintiff complained about being forgetful and being unable to complete tasks or get along with others.  <u>Id.</u> at 58-59, 63.  Plaintiff lives with his mother.  <u>Id.</u> at 61.  Although he is able to cook for himself and shower, he requires assistance getting dressed.  <u>Id.</u>

A VE also testified at the administrative hearing.  <u>Tr.</u> at 67-77.  The VE characterized Plaintiff's prior positions as follows:  repairman and yard jockey are both

---

[5]Zyprexa (generic olanzapine) is an "atypical antipsychotic" used to treat schizophrenia or bipolar 1 disorder.  <u>See</u> https://www.drugs.com/zyprexa.html (last visited Dec. 3, 2025).

medium, semi-skilled jobs, but as performed, they were light jobs. Id. at 73-74. The

material tech job is a heavy, semi-skilled job, performed as a light job; and the concrete

finisher is a very heavy, unskilled job, performed as a light job. Id. at 74. Based on the

hypothetical posed by the ALJ with the limitations included in the ALJ's RFC

assessment, see supra at 4-5, the VE testified that such an individual could not perform

any of Plaintiff's past relevant work. Tr. at 74. However, the VE testified that such an

individual could perform work as a cashier, sorter, and office helper. Id. at 74-75.[6] The

VE also testified that a limitation to sedentary work with the same limitations would

eliminate all work and absence or tardiness four times a month would eliminate all work.

Id. at 75-76.

     **C.**    **Medical Evidence Summary**[7]

         1.    Treatment Providers

              a.    Physical Impairments

Plaintiff has a history of a left ACL reconstruction, benign prostatic hyperplasia

("BPH"),[8] cocaine abuse, hypertension, hypothyroidism, hyperlipidemia, and bipolar

---

[6]When the ALJ asked the VE to consider additional limitations to only occasional interaction with supervisors, coworkers, and the general public; no shared tasks; low stress; and the ability to carry out detailed but uninvolved written and oral instructions with no assembly line work or hourly quotas, the VE testified that the office helper and sorter positions would be available, and added the job of marker. Id. at 75.

[7]Plaintiff's claims focus on his physical impairments rather than mental health impairments. Therefore, I will focus primarily on his physical impairments in providing this summary.

[8]BPH is "age-associated enlargement of the prostate resulting from proliferation of both glandular and stromal elements, beginning generally in the fifth decade of life; it

disorder.  See tr. at 362 (listing health problems), 914 (x-ray of left knee).  On December

20, 2019, Plaintiff was hospitalized "for suspected chemical burns with lesions (abscess

and blood blisters) to [his bilateral thumbs]."  Id. at 478.  A plastic surgeon performed

incision and drainage on both thumbs.  Id.  Plaintiff's recovery was hampered by

infection, but on February 17, 2020, Randolph Wojcik, M.D., noted Plaintiff's "pain is

controlled" and cleared him for a "return to work" with no restrictions.  Id. at 474.

On March 9, 2022, Plaintiff began treating with Sami Moussa, M.D., as his

primary care physician.  Tr. at 683-86.  Dr. Moussa diagnosed Plaintiff with

hypothyroidism for which he continued levothyroxine, hypertension for which he

continued metoprolol succinate, BPH with urinary obstruction and lower urinary tract

symptoms and enlarged prostate for which he prescribed tadalafil, GERD for which he

prescribed pantoprazole and discontinued omeprazole, elevated PSA[9] for which he

prescribed silodosin and discontinued Flomax, hyperlipidemia associated with type 2

diabetes mellitus for which he prescribed rosuvastatin.[10]  Id.  Dr. Moussa's notes indicate

---

may cause urethra compression and obstruction."  Dorland's Illustrated Medical
Dictionary, 32nd ed. (2012), ("DIMD"), at 894.

[9]PSA (Prostate-Specific Antigen) is "[a] protein made by the prostate gland and
found in the blood.  PSA blood levels may be higher than normal in men who have
prostate cancer, BPH, or infection or inflammation of the prostate gland.  See
https://www.cancer.gov/publications/dictionaries/cancer-terms/def/psa (last visited Dec.
17, 2025).  A PSA level above 4.0 is considered abnormal.  See
https://www.cancer.gov/types/prostate/psa-fact-sheet (last visited Dec. 17, 2025).

[10]Levothyroxine is used to treat hypothyroidism (underactive thyroid where the
thyroid gland does not produce enough thyroid hormone).  See
https://www.drugs.com/levothyroxine.html.  Metoprolol succinate is a beta-blocker used
to treat hypertension.  See https://www.drugs.com/metoprolol.html.  Tadalafil (brand

that Plaintiff had no complaints of arthralgias and myalgias.  Id. at 685.  A week later,

Plaintiff phoned Dr. Moussa's office, requesting an MRI of his lumbar spine because he

was having back pain.  Id. at 682.  Dr. Moussa explained that Plaintiff would have to

have x-rays done first.  Id.

On March 30, 2022, Plaintiff went to the emergency room at Lehigh Valley

Hospital Muhlenberg for abdominal and flank pain and an inability to urinate.  Tr. at 364-

70.  Nicole Gesell, D.O., inserted a Foley catheter and recommended admission for

antibiotics.  Id. at 365.  Plaintiff left the hospital against medical advice.  Id.  Plaintiff

continued to complain of pain.  See id. at 680 (Mar. 31, 2022 – phone call to Medical

Center Circle), 680 (Apr. 4, 2022 – call to 1521 8th Avenue Center, requesting follow up

appointment and notation by Avery Bryant, CRNP, "to schedule [an] appointment with a

physician, [noting that Plaintiff] has not been seen since 2018[.  It] sounds like he needs

definitive prostate treatment.").  When Plaintiff followed up with his urologist regarding

his BPH on April 8, 2022, Brian Murphy, M.D., ordered a diagnostic PSA.  Id. at 676-90.

---

name Cialis) is to treat erectile dysfunction and symptoms of BPH.  See
https://www.drugs.com/tadalafil.html.  Pantoprazole is a proton pump inhibitor that
decreases acid produced in the stomach, used to treat GERD and other conditions
involving stomach acid.  See https://www.drugs.com/pantoprazole.html.  Omeprazole is
used to treat excess stomach acid in conditions such as GERD.  See
https://drugs.com/omeprazole.html.  Silodosin is an alpha-blocker used to improve
urination in men with BPH.  See https://www.drugs.com/mtm/silodosin.html.  Flomax is
an alpha blocker used to treat the symptoms of BPH, including difficulty urinating,
painful urination, and urinary frequency and urgency.  See
https://www.drugs.com/flomax.html.  Rosuvastatin (brand name Crestor) is used to treat
high cholesterol and prevent heart attacks and strokes.  See
https://www.drugs.com/rosuvastatin. html (last visited Dec. 17, 2025).

Dr. Moussa saw Plaintiff for his "[r]egular check [u]p," on June 21, 2022, indicating "few symptoms." Tr. at 857-59. The doctor noted complaints of back pain and "[t]enderness present." Id. at 859. Plaintiff's bipolar 1 disorder was stable on Zyprexa, and Dr. Moussa changed Plaintiff's diabetes medication from atorvastatin to Crestor,[11] and referred Plaintiff to the Comprehensive Spine Program for chronic low back pain without sciatica. Id. at 857-58. Unfortunately, later that day, James H. Barnes, R.N., at the Comprehensive Spine Program, notified Plaintiff that they did not take his insurance. Id. at 860.

Kevin David Valvano, D.O., saw Plaintiff at Whitehall Care Now on July 12, 2022, for poison ivy, for which he provided an injection of prednisone and prescribed prednisone tablets.[12] Tr. at 854-57. On July 23, 2022, Danielle Sultan, D.O., saw Plaintiff at the Lehigh Valley Hospital Muhlenberg Emergency Room for a laceration of the left index finger. Id. at 869-73. Dr. Sultan gave Plaintiff a tetanus shot and three stitches. Id. at 870, 872.

X-rays performed on August 8, 2022 revealed as follows. Plaintiff's left knee showed that he was "[s]tatus post ACL reconstruction[, and had] [m]ild patellofemoral joint space compartment degenerative change[,] [d]orsal patellar spurring[, and] [t]ibial

---

[11]Atorvastatin is used to treat high cholesterol and to reduce the risk of heart attack, stroke, and angina. See https://www.drugs.com/atorvastatin.html (last visited Dec. 17, 2025).

[12]Prednisone is a corticosteroid used to decrease inflammation and used to treat allergic disorders, skin conditions, ulcerative colitis, and other conditions. See https://www.drugs.com/prednisone.html (last visited Dec. 17, 2025).

tuberosity spurring." Tr. at 914.  The right knee showed "[s]uperior dorsal patellar

spurring." Id. at 915.  The lumbar spine showed "[m]ild to moderate multilevel

degenerative changes." Id. at 916.

At a routine physical on October 11, 2022, performed by Dr. Moussa, Plaintiff

complained of back pain and numbness. Tr. at 931-32.  The doctor found abdominal

tenderness and musculoskeletal tenderness. Id. at 932-33.  The doctor ordered x-rays of

the lumbar spine, hip, and pelvis. Id. at 930.  Dr. Moussa also noted that Plaintiff was

"nervous/anxious." Id. at 925.  X-rays of the right hip/pelvis performed on November 25,

2022 revealed mild right hip osteoarthritis, tr. at 956-57, and the left hip showed

moderate degenerative change and "CAM femoral acetabular impingement."  Id. at 957-

59.[13]  X-rays of the lumbar spine were normal. Id. at 960-61.

On March 3, 2023, Plaintiff had a follow up visit with Dr. Moussa. Tr. at 1297-

1308.  Plaintiff complained of back pain and difficulty urinating. Id. at 1300.  The doctor

noted general musculoskeletal tenderness. Id. at 1288.

Plaintiff began physical therapy in April 2023 to address lower back pain and

osteoarthritis of the left hip. Tr. at 1266-67.  On initial evaluation, physical therapist

("PT") Maria Deblasio noted "abnormal coordination and gait, restricted range of motion,

impaired balance and physical strength, pain with function, and weight-bearing

---

[13]Femoroacetabular impingement "occurs when the femoral heal (ball of the hip)
pinches up against the acetabulum (cup of the hip).  When this happens, damage to the
labrum (cartilage that surrounds the acetabulum) can occur, causing hip stiffness and
pain, and can lead to arthritis." See https://www.hopkinsmedicine.org/health/conditions-
and-diseases/hip-impingement (last visited Dec. 17, 2025).

intolerance.  Id. at 1267.  On April 18, 2023, Plaintiff reported "already feeling some improvement with his hip mobility."  Id. at 1260.  After four sessions, PT Jenna Danner noted that Plaintiff complained of "significant" pain in his left groin/hip and had to reduce hip abduction exercise.  Id. at 1232.  On May 4, 2023, after seven sessions, PT Deblasio noted that Plaintiff "has made good progress with his lumbar and left hip range of motion, left hip strength, and tolerance to activity."  Id. at 1218.  On May 25, 2023, PT Deblasio noted that Plaintiff had "good tolerance to progression of program with appropriate challenge and fatigue, no increase in left hip or low back pain."  Id. at 1169.  On June 2, 2023, Plaintiff reported "a little frustrat[ion] that he is not making more progress," and said he would follow up with his primary care physician.  Id. at 1161.  On June 6, 2023, Plaintiff reported that his primary care physician recommended he return to an orthopedist for further evaluation of the left hip, and his urologist recommended he avoid using the bike until he has his PSA level tested.  Id. at 1151.  No further physical therapy notes are contained in the record.

On May 23, 2023, Zachary J. Piotrowsky, M.D., saw Plaintiff at St. Luke's Center for Urology for an annual follow up.  Tr. at 1128, 1309.   Plaintiff complained of nocturia, urine frequency and urgency, arthralgias, and back pain.  Id. at 1128, 1130, 1311.  His physical examination was normal.  Id. at 1130-31, 1312.  Dr. Piotrowsky diagnosed Plaintiff with BPH with obstruction/lower urinary tract symptoms, and elevated PSA (7.91), BPH with obstruction/lower urinary tract symptoms.  Tr. at 1120-48, 1309.

12

b.     Mental Impairments

The record includes several hospital admissions or emergency room visits related to Plaintiff's mental health impairments and drug use.  On March 18, 2020, the police brought Plaintiff to Lehigh Valley Hospital West Gate when Plaintiff "was having a manic episode where he was chasing a car wearing only a bath towel."  Tr. at 420-21. Plaintiff was admitted with diagnoses of hallucinations, paranoia, and manic psychosis. Id. at 470.  During his admission, he was treated with Zyprexa, and Siddhartha Maru, M.D., noted that "his anger and lability . . . . problems were likely due to substance use on an underlying bipolar disorder."  Id. at 471.  Plaintiff was discharged on March 23, 2020, with outpatient follow up.  Id.[14]

On April 17, 2020, police escorted Plaintiff to the West Gate emergency room after he had an argument with his mother.  Tr. at 370.  Steven Frei, M.D., noted that Plaintiff appeared "paranoid with somewhat disorganized thoughts."  Id. at 372.  Plaintiff was voluntarily admitted.  Id. at 379.  During his admission, he was "stabilized on Zyprexa."  Id. at 414.  He was discharged on April 21, 2020, with diagnoses of bipolar

---

[14]The record includes treatment notes for hospital visits/admissions related to Plaintiff's bipolar disorder and drug use predating the relevant period.  See tr. at 334-36 (10/18-20/17 – Horsham Clinic, 201 voluntary admission with diagnoses unspecified mood disorder and cocaine use disorder, intermittent), 768-70 (7/15-24/18 – St. Luke's, 302 involuntary commitment with diagnoses of bipolar 1 disorder, most recent episode mixed, severe with psychotic features; stimulant abuse; and cocaine abuse, continuous use), 342-44 (10/27 – 11/2/18 – Brooke Glen Behavioral Hospital, diagnoses of bipolar disorder 1, manic, severe, without psychosis, and cocaine use, severe).

disorder, current episode mixed, severe, with psychotic features, cocaine use disorder, and adult antisocial behavior.  Id. at 415-16.

Although Dr. Moussa's notes do not indicate any psychiatric referral, on October 12, 2022, the Psychiatric Associates Bethlehem called Plaintiff "regarding (ASAP) referral."  Id. at 928.  Plaintiff was ultimately placed on the waiting list for medication management on October 20, 2022.  Id. at 929.

On January 18, 2023, the police found Plaintiff "w[a]ndering the street with no clothes on acting bizarre.  (Pacing, hitting head on things, running around)."  Tr. at 977.  When EMS administered 5mg Versed, Plaintiff became apneic and EMS administered Narcan.[15]  Id. at 977-78.  Plaintiff tested positive for cannabinoids, benzodiazepines, and amphetamines, was diagnosed with substance abuse and a mental health problem, treated with Ativan and Zyprexa, and discharged.[16]  Id. at 993, 1038-39.

2.    Consultative Examiners and State Agency Medical Consultants

On July 28, 2022, Ziba Monfared, M.D., conducted a consultative internal medicine examination.  Tr. at 880-84.  The doctor found Plaintiff's gait was normal, he had difficulty with balance, and was able to do an 80% squat due to knee and back pain.  Id. at 882.  At the time of the examination, Plaintiff had stitches in his left index finger,

---

[15]Versed (generic midazolam) is a benzodiazepine used to help you relax before having minor surgery, dental work, or other medical procedures.  See https://www.drugs.com/mtm/versed.html (last visited Dec. 17, 2025).

[16]Ativan is a benzodiazepine used to treat anxiety disorders.  See https://www.drugs.com/ativan.html (last visited Dec. 17, 2025).

which was bandaged.  Id. at 880.  Due to the injury and bandage on the left index finger, finger dexterity was limited on the left hand.  Plaintiff's hand and finger dexterity and grip strength were intact on the right hand.  Id. at 883.  Dr. Monfared diagnosed chronic back pain with no radiculopathy during the exam, bilateral knee pain with severe balance difficulties, hypertension, BPH, hypercholesterolemia, history of hypothyroidism, an acute injury of the left index finger, and a history of cellulitis on the bilateral thumbs.  Id. at 883-84.

Dr. Monfared found Plaintiff had reduced range of motion in his lumbar spine, and the left index finger due to injury.  Tr. at 892, 895.  The doctor also found Plaintiff could frequently lift and carry up to 10 pounds and occasionally lift and carry up to 20 pounds.  Tr. at 885.  Plaintiff could sit for 8 hours a day and stand and walk for 7 hours a day in 4-hour increments.  Id. at 886.  Plaintiff could occasionally climb stairs and ramps, ladders and scaffolds, stoop, kneel, and crawl; and never balance or crouch.  Id. at 888.  Dr. Monfared noted that Plaintiff cannot walk a block on rough or uneven surfaces.  Id. at 890.

On July 28, 2022, Gregory Coleman, Psy.D., conducted a consultative mental status evaluation.  Tr. at 900-04.  On examination, Plaintiff's speech was fluent, thought processes were coherent and goal directed, affect was appropriate, mood was neutral, attention and recent and remote memory were intact, cognitive functioning was average, and his insight and judgment were good.  Id. at 902-03.  Dr. Coleman diagnosed Plaintiff with MDD, moderate in severity with anxious distress and alcohol use disorder by reported history.  Id. at 903.  Based on his examination, Dr. Coleman found Plaintiff had

15

no limitation in his abilities to understand, remember, and carry out instructions or in his abilities to interact with supervisors, co-workers, and the public.  <u>Id.</u> at 905-06.

On August 16, 2022, at the Agency's initial consideration stage, Pamela Irene Gianni, M.D., found from her review of the records that Plaintiff could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds, sit for 6 hours and stand/walk for 6 hours in an 8-hour workday.  <u>Tr.</u> at 84-85, 94-95.  Dr. Gianni found Plaintiff could occasionally balance and climb ladders, ropes, and scaffolds.  <u>Id.</u> at 85, 95.  In all other respects, Plaintiff had no postural limitations.  <u>Id.</u>  The doctor also found Plaintiff should avoid concentrated exposure to extreme cold, wetness, humidity, vibration, and hazards. <u>Id.</u>

At the reconsideration stage, on January 19, 2023, Catherine S. Smith, M.D., found identical limitations in lifting/carrying, and sitting, standing/walking, <u>tr.</u> at 104, 113, but found Plaintiff suffered from additional postural limitations, noting that Plaintiff should never crawl or climb ladders, ropes, or scaffolds, and could occasionally perform all other postural activities (balancing, stooping, kneeling, and crouching).  <u>Id.</u> at 105, 114.

On August 4, 2022, at the initial consideration stage, Erin Nicole Urbanowicz, Psy.D., found from her review of the records that Plaintiff suffered from depressive, bipolar and related disorders, anxiety and obsessive-compulsive disorders, and substance addiction disorder, but found that none of these mental impairments was severe.  <u>Tr.</u> at 83, 93.  According to Dr. Urbanowicz, Plaintiff had no limitation in the abilities to understand, remember, or apply information; and mild limitations in the abilities to

16

interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. Id.

At the reconsideration stage, on December 23, 2022, Lori Anne Young, Psy.D., found from her review of the records that Plaintiff's mental health impairments were not severe. Tr. at 102, 111. Like Dr. Urbanowicz, Dr. Young found Plaintiff had mild limitations in the abilities to interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself, but unlike Dr. Urbanowicz, also found mild limitations in his abilities to understand, remember, or apply information. Id. at 103, 112.

### D.    **Plaintiff's Claims**

####      1.    Consideration of Agency Medical Consultants' Opinions

Plaintiff complains that the ALJ failed to consider the persuasiveness and supportability of the medical consultants' opinions. Doc. 8 at 3-5; Doc. 10 at 1-3. Defendant responds that the ALJ properly considered the opinions of the Drs. Gianni and Smith and that their opinions are consistent with the ALJ's RFC assessment for light work. Doc. 9 at 12-13.

The ALJ's consideration of medical opinion evidence is governed by regulations which focus on the persuasiveness of each medical opinion.

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources.

20 C.F.R. §§ 404.1520c(a); 416.920c(a). The regulations list the factors to be utilized in considering medical opinions: supportability, consistency, treatment relationship

17

(including the length and purpose of the treatment and frequency of examinations),

specialization, and other factors including familiarity with other evidence in the record or

an understanding of the disability program.  Id. §§ 404.1520c(c); 416.920c(c).  The most

important of these factors are supportability and consistency, and the regulations require

the ALJ to explain these factors, but do not require discussion of the others.  Id.

§§ 404.1520c(b)(2); 416.920c(b)(2).  The regulations explain that supportability means

"[t]he more relevant the objective medical evidence and supporting explanations

presented by a medical source are to support his or her medical opinion(s) . . . , the more

persuasive the medical opinions . . .  will be."  Id. §§ 404.1520c(c)(1); 416.920c(c)(1).  In

addition, consistency means "[t]he more consistent a medical opinion(s) . . .  is with the

evidence from other medical sources and nonmedical sources . . . , the more persuasive

the medical opinion(s) . . . will be."  Id. §§ 404.1520c(c)(2); 416.920c(c)(2).

Plaintiff argues that "[t]he ALJ's entire analysis of the [medical consultants']

opinions was one conclusory paragraph which did not contain any indication as to the

ALJ's finding of persuasiveness or any discussion of supportability and consistency of

the opinions as required by 20 C.F.R. § 404.1520c."  Doc. 8 at 3.

> In August 2022, State agency medical consultant Pamela
> Gianni, M.D.[,] determined that [Plaintiff] is capable of a range of
> light work activity with occasional climbing of ladders, ropes, or
> scaffolds[,] and balancing.  The doctor further noted that [Plaintiff]
> should avoid concentrated exposure to extreme cold, wetness,
> humidity, vibration, and hazards ([Tr. at 80-88, 90-98]).  Upon
> reconsideration in January 2023, this opinion was mostly affirmed
> by Catherine Smith, M.D.[,] who added that [Plaintiff] should also
> only occasionally climb ramps/stairs, stoop, and kneel[,] and never
> crawl ([id. at 100-08, 109-17]).

Doc. 8 at 3-4 (quoting tr. at 34).

In analyzing an ALJ's decision, this court must not consider the ALJ's findings in isolation; rather, the Third Circuit has instructed that an ALJ's decision is to be read "as a whole." Fullen v. Comm'r of Soc. Sec., 704 Fed. App'x 121, 124 (3d Cir. 2017) (citing Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004)). Although the ALJ does not mention supportability or consistency in the quoted paragraph, the court can find discussion of these factors elsewhere in the ALJ's decision.

The ALJ conducted a fulsome review of the medical evidence in explaining her RFC findings, tr. at 31-33, and concluded that "any limitations that [Plaintiff] experiences as a result of his severe and non-severe impairments . . . are adequately accommodated by the restrictions found in the established [RFC]." Id. at 33. The ALJ also reviewed Plaintiff's daily activities, including performing personal care with the need for some assistance with dressing, cooking and preparing meals, cleaning, laundry, mowing the lawn, shopping, managing money, driving, using public transportation, and socializing with family and friends, and concluded that these activities are "not as limited as one would expect, given the complaints of disabling symptoms and limitations." Id. at 33.

Additionally, the ALJ analyzed the opinion evidence, noting that consultative examiner Dr. Monfared's opinion, limiting Plaintiff to a range of light work was "partially persuasive." Tr. at 34.

> [A] restriction to a range of light work with additional postural, manipulative, and environmental limits is well-supported by the doctor's own narrative report and examination findings and generally consistent with the record as a whole. However, the undersigned notes that the

> proposed left upper extremity limits are based on [Plaintiff's]
> recent lacerate[on] injury to the left index finger and do not
> represent [Plaintiff's] level of functioning over the entire
> relevant period.

Id.  The ALJ's discussion of Dr. Monfared's opinion, limiting Plaintiff to a range of light

work, is equally applicable to similar findings by the Agency medical consultants.[17]

    After discussing the medical evidence, Plaintiff's activities, and the opinion

evidence, the ALJ summarized her findings.  "Based on the foregoing, the undersigned

finds [Plaintiff] has the above [RFC] assessment, which is supported by [Plaintiff's]

treatment history, the objective clinical findings, [Plaintiff's] subjective complaints, and

all of the medical opinion and evidence of record."  Tr. at 34.  When read "as a whole,"

see Fullen, 704 Fed. App'x at 124; Jones, 364 F.3d at 505), the ALJ's decision

adequately addressed the supportability and consistency of the Agency medical

consultants' opinions.

### 2.    Function-by-Function Assessment

Plaintiff also complains that the ALJ failed to "articulate Plaintiff's ability to stand

and walk within the RFC."  Doc. 8 at 5.  Specifically, Plaintiff argues that the ALJ failed

to include any standing or walking limitations in her RFC assessment, noting that each of

the three opinions in the record –  from Drs. Monfared, Gianni, and Smith – included

---

[17]I note that while Drs. Gianni and Smith concluded that Plaintiff could stand/walk
for 6 hours in an 8-hour workday, Dr. Monfared found that Plaintiff could stand and walk
for 7 hours each in an 8-hour workday.  Yet, Plaintiff does not challenge the ALJ's
consideration of Dr. Monfared's opinion, including the ALJ's decision that the restriction
to a range of light work was "well-supported by the doctor's own narrative report and
examination findings and generally consistent with the record as a whole."  Tr. at 34.

some level of standing and walking limitation.  Id.  Yet, the ALJ failed to include any

such limitation, finding Plaintiff capable of light work with other non-exertional

limitations.  Id. at 5-6.  Plaintiff relies on Social Security Ruling ("SSR") 96-8p and

Barbour v. Kijakazi, Civ. No. 20-861, 2021 WL 4478332 (M.D. Pa. Sept. 30, 2021),

arguing that remand is required because the ALJ failed to conduct the function-by-

function assessment required.  Doc. 9 at 13.

SSR 96-8p addresses the assessment of RFC in disability claims, and states in

relevant part,

> Exertional capacity addresses an individual's limitations and
> restrictions of physical strength and defines the individual's
> remaining abilities to perform each of seven strength
> demands:  Sitting, standing, walking, lifting, carrying,
> pushing, and pulling.  Each function must be considered
> separately (e.g., "the individual can walk for 5 out of 8 hours
> and stand for 6 out of 8 hours"), even if the final RFC
> assessment will combine activities (e.g., "walk/stand,
> lift/carry, push/pull").  Although the regulations describing
> the exertional levels of work and the Dictionary of
> Occupational Titles and its related volumes pair some
> functions, it is not invariably the case that treating the
> activities together will result in the same decisional outcome
> as treating them separately.

SSR 96-8p, "Titles II and XVI: Assessing Residual Functional Capacity in Initial

Claims," 1996 WL 374184, at *5 (July 2, 1996).  Plaintiff complains that the ALJ's

failure to set out individual standing and walking limitations violated SSR 96-8p and

requires remand.  Doc. 8 at 6.  Defendant responds that "Drs. Gianni and Smith found

Plaintiff capable of standing and/or walking (with normal breaks) for a total of '[a]bout 6

hours in an 8 hour workday' (Tr. 85, 95, 104, 113).  This finding is consistent with the

regulatory definition of light work, which involves standing or walking, off and on, for *approximately six hours of an eight-hour workday.* SSR 83-10, 1983 WL 31251[,] at *6; 20 C.F.R. §§ 404.1567(b), 416.967(b); SSR 83-10, 1983 WL 31251[,] at *5." Doc. 9 at 13 (emphasis in original).[18]

The district courts of this circuit, including in <u>Barbour v. Kijakazi</u>, Civ. No. 20-861, 2021 WL 4478332 (M.D. Pa. Sept. 30, 2021), upon which Plaintiff relies, have found that "[a]n ALJ's failure to conduct a function-by-function assessment does not require remand where the ALJ's decision is otherwise supported by substantial evidence." <u>Id.</u> at *5; <u>see also</u> <u>Honey v. Bisignano</u>, Civ. No. 23-1382, 2025 WL 2712426, at *8 (M.D. Pa. Sept. 23, 2025) ("RFC determination must include an explanation of the substantial evidence upon which it relies."). In <u>Brooks v. Saul</u>, my colleague, the Honorable Lynne Sitarski, rejected the same argument offered here.

> In support of her argument that the ALJ failed to provide a function-by-function analysis of how many hours she could stand and walk, Plaintiff relies on SSR 96-8p, which provides in relevant part that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96-8p, 1996 WL 374184, at *1. However, the Third Circuit has stated that "[t]his language does not command ALJs to make specific, written

---

[18]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little a job is in this category when it requires a good deal of walking or standing, or when it involves sitting mot of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.967(b); 416.1567(b). "[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, "Titles II and XVI: Determining Capability to Do Other Work-The Medical-Vocational Rules of Appendix 2," 1983 WL 31251, at *6 (1983).

> findings on dozens of individual work function categories."
> <u>Bencivengo v. Comm'r of Soc. Sec.</u>, 251 F.3d 153 (table),
> No. 11-1995, slip op. at 4 (3d Cir. Dec. 19, 2000).  The court
> explained that "[a]lthough a function-by-function analysis is
> desirable, SSR 96-8p does not require ALJs to produce such a
> detailed statement in writing."  <u>Id.</u>  Rather, the court reasoned
> the "Narrative Discussion Requirements" in the Ruling
> "describes more fully what an ALJ must articulate regarding a
> claimant's RFC"; specifically, that "[i]n his or her written
> opinion, the ALJ need only articulate how the evidence in the
> record supports the RFC determination, discuss the claimant's
> ability to perform sustained work-related activities, and
> explain the resolution of any inconsistencies in the record."
> <u>Id.</u> at 4-5 (citing SSR 96-8p, 1996 WL 374184, at *7).

Civ. No. 19-2855, 2019 WL 7048794, at *7 (E.D. Pa. Dec. 23, 2019).

As previously discussed, the ALJ adequately explained her consideration of the

opinion evidence and concluded that the RFC was supported by "all of the medical

opinions."  <u>Tr.</u> at 34.  Also, as previously noted, "light work requires standing or walking,

off and on, for a total of approximately 6 hours of an 8-hour workday."  SSR 83-10, 1983

WL 31251, at *6.  This is consistent with the opinions of Drs. Gianni and Smith, and

more restrictive than Dr. Monfared.  I find no error in the ALJ's analysis.

IV.    <u>**CONCLUSION**</u>

The ALJ's decision is supported by substantial evidence.  When the ALJ's opinion

is read as a whole, it is clear that the ALJ properly considered the Agency medical

consultants' opinions and the ALJ's failure to delineate specific standing and walking

requirements does not require remand in light of her fulsome discussion of the evidence

and the fact that the ALJ's RFC limitation to light work was consistent with or more

restrictive than the standing and walking limitations contained in each of the medical

opinions of record.

An appropriate Order follows.